UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SHANNON M. DALRYMPLE,    )
    )
    Plaintiff,    )    Case No. 1:11-cv-20
    )
v.    )    Honorable Joseph G. Scoville
    )
COMMISSIONER OF    )
SOCIAL SECURITY,    )
    )    **OPINION**
    Defendant.    )
_____)

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claim for disability insurance benefits (DIB). On April 5, 2006, plaintiff filed her application for benefits alleging a July 1, 2002 onset of disability. (A.R. 72-74). Her claim was denied on initial review. On August 13, 2008, she received a hearing before an administrative law judge (ALJ), at which she was represented by counsel. (A.R. 957-93). On December 19, 2008, the ALJ issued a decision finding that plaintiff was not disabled. (A.R. 17-31). On December 6, 2010, the Appeals Council denied review (A.R. 6-9), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision denying her claim for DIB benefits. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties voluntarily consented to have a United States magistrate judge conduct all further proceedings in this case, including entry of final judgment. (docket # 7). Plaintiff asks the court to overturn the Commissioner's decision on the following grounds:

1.     The ALJ's finding that plaintiff has a severe substance abuse disorder is not supported by substantial evidence;

2.     The ALJ's finding that plaintiff's substance use disorder was material to a finding of disability is not supported by substantial evidence;

3.     "There is substantial evidence in the record that claimant's mental impairments, absent a substance use disorder, more specifically, her diagnoses of bipolar II disorder, severe with psychotic features/chronic (Dr. George Starrett) and/or major depressive disorder, recurrent, severe, generalized anxiety disorder rule out bipolar disorder, personality disorder not otherwise specified (Dr. Daniel Walberer) met or equaled the requirements of listing 12.04[;]"

4.     "There is substantial evidence in the record that the claimant's mental impairments, absent any substance use disorder, together with her limited education and no relevant transferrable skills warrant a determination that she is under a disability as defined in the Social Security Act since the date of her denial[;]" and

5.     "The ALJ's five-step analysis is both factually and legally flawed."

(Plf. Brief at 2-3, Statement of Errors, docket # 8).  Upon review, the Commissioner's decision will be affirmed.

**Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007).  The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the

-2-

evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see  Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

### Discussion

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on July 1, 2002, her alleged onset of disability, and continued to meet the

requirements through the date of the ALJ's decision.  (A.R. 20).  Plaintiff had not engaged in

substantial gainful activity on or after July 1, 2002.  (A.R. 20).  Plaintiff had the following severe

impairments: "bipolar disorder, narcotic addiction, and asthma."  (A.R. 20).  The ALJ found that

plaintiff's substance use disorder met the severity criteria of listing 12.04, but absent substance use,

plaintiff did not have an impairment or combination of impairments which met or equaled the

requirements of the listing of impairments.  (A.R. 24-25).  Plaintiff retained the following residual

functional capacity (RFC):

> Absent the claimant's substance use disorder, she retains the residual functional capacity to
> perform the requirements of work at all exertional levels but with the following
> nonexertional limitations:  she is limited to simple job tasks within a structured work setting;
> she cannot maintain more than occasional contact with supervisors; and she must avoid
> exposure to respiratory irritants (fumes, odors, dust, temperature extremes, etc.).

(A.R. 26).  The ALJ found that plaintiff's testimony regarding her subjective limitations was not

fully credible.  (A.R. 26-29).  Plaintiff was unable to perform her past relevant work.  (A.R. 29).

Plaintiff was 32-years-old as of the date of her alleged onset of disability and 38-years-old as of the

date of the ALJ's decision.  Thus, at all times relevant to her claim for DIB benefits, plaintiff was

classified as a younger individual.  (A.R. 29).  Plaintiff has a limited education and is able to

communicate in English.  (A.R. 29).  The ALJ found that plaintiff's skills from her past relevant

work were not transferable to the activities of other work within her RFC.  (A.R. 29).  The ALJ then

turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding

a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that

there were approximately 24,500 jobs in the State of Michigan that the hypothetical person would

be capable of performing.  (A.R. 990-91).  The ALJ found that this constituted a significant number

of jobs.  (A.R. 30).  The ALJ found that plaintiff was not disabled because her substance use was material to a finding of disability.  (A.R. 30-31).

### 1.

Plaintiff relies on evidence that she never presented to the ALJ.  (Plf. Brief at 14 and Exs. A and B).  This is patently improper.  It is clearly established law within the Sixth Circuit that the ALJ's decision is the final decision subject to review by this court in cases where the Appeals Council denies review.  This court must base its review of the ALJ's decision on the administrative record presented to the ALJ.  The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Jones v. Commissioner*, 336 F.3d at 478; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001);  *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also  Osburn v. Apfel*, No. 98-1784, 1999 WL 503528, at * 4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  The court is not authorized to consider plaintiff's proposed additions to the record in determining whether the Commissioner's decision is supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Cline*, 96 F.3d at 148.

The last sentence of plaintiff's brief contains a passing request for alternative relief in the form of remand.  (Plf. Brief at 19).  Her reply brief concludes with an identical request.  (Reply

Brief at 5, docket # 10). "A district court's authority to remand a case for further administrative proceedings is found in 42 U.S.C. § 405(g)." *Hollon v. Commissioner*, 447 F.3d 477, 482-83 (6th Cir. 2006). The statute permits only two types of remand: a sentence four (post-judgment) remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six (pre-judgment) remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *Hollon*, 447 F.3d at 486 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991)); *see Allen v. Commissioner*, 561 F.3d 646, 653-54 (6th Cir. 2009). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context. It only can consider such evidence in determining whether a sentence-six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d at 357.

Plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) of demonstrating that the evidence she now presents in support of a remand is "new" and "material," and that there is "good cause" for the failure to present this evidence in the prior proceeding. *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010). Courts "are not free to dispense with these statutory requirements." *Hollon*, 447 F.3d at 486. The proffered evidence (docket #s 8-1, 8-2, ID#s 39-42) is new because it was generated after the ALJ's decision. *See Ferguson*, 628 F.3d at 276; *Hollon*, 447 F.3d at 483-84.

"Good cause" is not established solely because the new evidence was not generated until after the ALJ's decision. *See Courter v. Commissioner*, No. 10-6119, 2012 WL 1592750, at * 11 (6th Cir. May 7, 2012). The Sixth Circuit has taken a "harder line." *Oliver v. Secretary of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). The moving party must explain why

the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision.  *See Ferguson*, 628 F.3d at 276.  Plaintiff has not addressed, much less carried, her burden of demonstrating good cause.

Finally, in order to establish materiality, plaintiff must show that the introduction of the evidence would have reasonably persuaded the Commissioner to reach a different conclusion.  *See Ferguson*, 628 F.3d at 276; *Foster v. Halter*, 279 F.3d at 357.  Plaintiff has not addressed or carried her burden.

Plaintiff's first piece of new evidence is a report by Sarat Kondapaneni, M.D., of a psychological evaluation dated March 10, 2009.  (docket # 8-1, ID#s 39-40).  Plaintiff advised Dr. Kondapaneni that she continued to use marijuana on a regular basis.  (*Id.* at ID# 39).  Dr. Kondapaneni offered the following diagnosis:

| | |
|---|---|
| Axis I: | Bipolar I Disorder, Most Recent Episode Depressed |
| | Posttraumatic Stress Disorder; Marijuana Abuse |
| Axis II: | Personality Disorder, NOS |
| Axis III: | Emphysema, asthma, back and hip pain |
| Axis IV: | Psycho social Stressors: Moderate to severe - no income or place to stay, lack of primary support group |
| Axis V: | GAF 35. |

(*Id.* at ID# 40).  Dr. Kondapaneni did not purport to evaluate plaintiff's condition on or before December 19, 2008, the date of the ALJ's decision.  Kondapaneni's March 10, 2009 evaluation would not have reasonably persuaded the Commissioner to reach a different decision on the issue of whether plaintiff was disabled on or before December 19, 2008.

On August 13, 2009, a social worker wrote a letter in support of plaintiff's request for discretionary review by the Appeals Council.  (docket # 8-2, ID#s 41-42).  A social worker is not an acceptable medical source.  *See* 20 C.F.R. §§ 404.1513(a), (d); *see also Payne v. Commissioner*,

402 F. App'x 109, 119 (6th Cir. 2010).  The letter would not have reasonably persuaded the Commissioner to reach a different decision on the issue of whether plaintiff was disabled on or before December 19, 2008.

Plaintiff has not demonstrated that remand pursuant to sentence six of 42 U.S.C. § 405(g) is warranted.  Plaintiff's request for a sentence-six remand is denied.  Plaintiff's arguments must be evaluated on the record presented to the ALJ.

**2.**

Plaintiff argues that there is not enough evidence to support the ALJ's finding that she has a severe substance use impairment because "April 5, 2006, to the present" should be considered the relevant time period:

> The relevant claim, which is before this court regarding the disability of the Plaintiff, Shannon Dalyrmple, is for the period from and after April 5, 2006, to the present.  Although Plaintiff has an onset date of July 1, 2002, the administrative record shows that she filed several prior applications for a period of disability and disability benefits (August 2002, June 2003, February 2005, and August 2005), none of which she appealed to the hearings level.  The ALJ found that there were no grounds that existed to reopen and revise any of the administration's earlier decisions.  (See Jurisdiction and Procedural History in the ALJ's decision).
>
> On April 5, 2006, the Plaintiff protectively filed an application for a period of disability and disability insurance benefits.  Therefore, the relevant time period would be from the date of her last denial following the August 2005, application.
>
> Although there is a history of substance abuse, there is little, if any, evidence to substantiate that the Plaintiff has a substance disorder for times relevant to her present claim.  The only evidence cited by the ALJ to support his determination that the Plaintiff now has or has had a substance use disorder, predates the relevant time periods in this disability claim.
>
> The ALJ cites in his opinion the hospitalization for mental health treatment in late June of 2004 at Forest View Psychiatric Hospital.  At that time, a urine drug-screening test performed upon admission was positive for marijuana and cocaine.  (See Exhibit 28F).  Furthermore, he cites the Plaintiff was previously hospitalized overnight for observation of her mental health in March 2004, following an arrest for writing bad checks, at which time she was also positive for cocaine and marijuana and amphetamines.  Lastly, he cites a brief hospitalization for observation in September 2005, at which time the admission record

indicates a urine drug-screening test again positive for cocaine and marijuana (Exhibits 38F and 51F pp 57-55[sic]).

(Plf. Brief at 6-7; *see also* Reply Brief at 1-2).  Plaintiff cites no legal authority in support of this argument.  Issues raised in a perfunctory manner are deemed waived.  *See Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012); *Geboy v. Brigano*, 489  F.3d 752, 767 (6th Cir. 2007).

Even assuming that plaintiff did not waive the issue, it is frivolous.  The relevant time period is the period from plaintiff's alleged onset of disability through the date of the ALJ's decision.  Throughout the entire administrative process, plaintiff claimed a July 1, 2002 onset of disability.  (A.R. 17, 20, 72, 115).  She never amended her alleged onset of disability.  Now, with the benefit of hindsight, she attempts to recast her claim as if she had asserted an April 5, 2006 onset of disability.  This is an ineffectual attempt to distance herself from a well-documented history of substance abuse.  If plaintiff wanted to modify her alleged onset date and limit her claim for DIB benefits to a period after April 5, 2006, the time to do so was before, not after, the Commissioner's final administrative decision.  Further, the ALJ's December 19, 2008 decision is the administrative decision under judicial review.[1]  The ALJ did not address plaintiff's condition for any time after December 19, 2008.  Plaintiff's "present" condition is irrelevant.

Suffice it to say that plaintiff never presented the ALJ with an argument that administrative *res judicata* stemming from the denial of her earlier applications for DIB benefits precluded any finding of disability before April 5, 2006.  (*See, e.g.*, A.R. 298-99, 959-93).  Her decision on this appeal to abandon any claim for DIB benefits for the period from July 1, 2002,

---

[1]The ALJ's decision against reopening the denial of earlier claims is not subject to judicial review.  *Califano v. Sanders*, 430 U.S. 99 (1977).  Plaintiff has not alleged any colorable constitutional claim, and absent such a claim, the decision against reopening earlier claims is not within the court's jurisdiction. *Id.* at 109.

through April 4, 2006, is a basis for affirming that portion of the ALJ's decision; it does not render the medical evidence for that period irrelevant.  Ironically, the evidence plaintiff listed in the above-quoted excerpt from her brief is more than substantial evidence supporting the ALJ's factual finding that she had a severe substance use disorder.  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Heston v. Commissioner*, 245 F.3d at 534.  Three positive drug tests is more than enough to support the ALJ's factual finding that plaintiff had a serious substance use problem.

Plaintiff attempts to restrict the evidence of her drug and alcohol abuse to the examples cited in a fragment of the ALJ's opinion.  However, the question before the court is whether the ALJ's findings are supported by substantial evidence in the record as a whole.  This record is replete with evidence of plaintiff's abuse of cocaine, narcotics, amphetamines, alcohol, and marijuana.  (A.R. 316, 321, 325, 340, 399, 412, 458-62, 479, 484, 536, 616, 624, 629, 634, 636-37, 655, 668, 670-71, 690-91, 716-17, 787, 789, 830-31, 886A, 889, 890, 892, 901, 919, 933, 934).  There is more than substantial evidence supporting the ALJ's factual finding that plaintiff had a substance use disorder during the entire period at issue:  July 1, 2002, through December 19, 2008.

### 3.

Plaintiff argues that the ALJ's finding that her substance use disorder was material to a finding of disability is not supported by substantial evidence.  (Plf. Brief at 8-9; Reply Brief at 2-3).  Since 1996, the Social Security Act, as amended, has precluded awards of SSI and DIB benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir.

2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004). The claimant bears the burden of demonstrating that her drug and alcohol addiction is not a contributing factor to her disability. *See Cage v. Commissioner*, 692 F.3d 118, 122-24 (2d Cir. 2012); *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004). The court finds that plaintiff has not carried her burden. The ALJ's finding that plaintiff's substance use was material to a finding of disability is supported by overwhelming evidence.[2]

On August 15, 2000, plaintiff appeared at the Borgess-Pipp Health Center emergency room seeking pain medication. She was 30-years old. She stated that "20-30" years earlier she had "used intravenous cocaine as a drug abuser." (A.R. 314). She denied any current use of street drugs. (A.R. 314). Her statement was proven false by her urine screen test, which was positive for both cocaine and marijuana. (A.R. 315, 321). Emergency room physicians expressed frustration and concern that plaintiff was "asking for pain medications and ha[d] a history of intravenous drug abuse," yet she declined to disclose her ongoing marijuana and cocaine use. (A.R. 316).

On September 6, 2002, doctors at the Borgess-Pipp emergency department described plaintiff as a "heavy smoker" who denied "any regular use of ethanol or drugs." (A.R. 368). She was resistant to staying in the emergency department and "kept running outside to smoke cigarettes." (A.R. 369).

---

[2]This administrative record documents plaintiff's years of substance abuse, her persistent lack of candor to treating medical care providers, and her outright lies in hearing testimony for which she was fortunate to avoid criminal prosecution for perjury. The medical record summarized herein provides extremely strong evidence that plaintiff's testimony that she had "never" used cocaine or alcohol (A.R. 978) was perjurous.

On October 29, 2002, plaintiff received a consultative psychological examination at Kalamazoo Psychology, LLC.  (A.R. 377-81).  She stated that she did not drink alcohol and that she smoked to help her relax.  (A.R. 378).  She was in contact with reality and oriented in all three spheres.  Her judgment was within normal limits.  The examiner offered a diagnosis of an adjustment disorder with mixed anxiety and depressed mood and gave plaintiff a global assessment of functioning (GAF) score of 61.  (A.R. 380).

On March 3, 2003, plaintiff reported to emergency room physicians at Borgess-Pipp that "she and her boyfriend were drinking and he became assaultive."  (A.R. 412).  Her social history was "remarkable for cigarettes and alcohol."  (A.R. 412).  Plaintiff reported that she was not currently taking any medications. (A.R. 412).  She was awake, alert and oriented in all three spheres.  The neurological examination of her upper and lower extremities was within normal limits.  A CT scan of her head returned normal results.  (A.R. 412-13).  On March 6, 2003, plaintiff, then age 33, gave a history of "[c]ocaine abuse 20 years ago."  (A.R. 426).  She was advised to quit smoking. (A.R. 427).  She returned on April 27, 2003, complaining of shortness of breath.  Her chest x-rays were normal.  (A.R. 436-38).

On July 17, 2003, police transported plaintiff to the emergency room of Allegan General Hospital.  She revealed that she was feigning suicidal intent in an attempt to persuade police not to take her boyfriend to jail:

> The patient is a 33-year old female who presents to the emergency department with the police after allegedly telling them that she was suicidal.  It started with her boyfriend being seen at another facility after being involved in a car/pedestrian accident.  The police came to investigate the accident.  It turns out that he had a couple of outstanding warrants, and they were taking him to jail when she told them that she was suicidal.  When I enter the room, she tells me immediately that the police might let her boyfriend go if she said that because she says she has done that before; but she really denies any suicidal ideation to me.

-12-

(A.R. 672).  Plaintiff complained of some shortness of breath.  She was treated and "discharged home with the police in stable condition."  (A.R. 673).

On July 27, 2003, plaintiff returned to the Borgess-Pipp emergency room.  She reported nausea and vomiting after drinking vodka with friends.  Her drug screen revealed ETOH (alcohol) abuse.  She was treated for alcohol intoxication and released.  (A.R. 458-61).  The hospital's discharge instructions were straightforward and emphatic: "No alcohol.  No smoking." (A.R. 462).

On August 20, 2003, plaintiff appeared at Borgess-Pipp complaining of headaches. Progress notes indicate that plaintiff received a shot of Dilaudid, went outside and had a cigarette, then returned and stated, "There is no pain.  I am really wasted."  She had a friend drive her home from the hospital.  (A.R. 743).  Four days later, she returned with similar headache complaints and told physicians that she did not drink alcoholic beverages.  (A.R. 735).

On September 2, 2003, plaintiff was treated in the emergency department at Allegan General Hospital.  She smelled of alcohol and reported that she had consumed about a pint of whiskey.  (A.R. 670-71).

On January 19, 2004, plaintiff was examined at Allegan General Hospital by Natalie Schwartz, M.D.  (A.R. 919).  Dr. Schwartz noted that plaintiff had been evaluated by Community Mental Health and she agreed with their assessment that plaintiff was not at risk for harming herself or others.  Her clinical impression was that plaintiff had multiple superficial lacerations on her wrists and problems with "drug abuse, marijuana and cocaine."  (A.R. 919).

On February 25, 2004, plaintiff was examined in the emergency department at Borgess-Pipp.  She complained that she had a headache.  She related that she had "just had a

-13-

prescription of 40 Lortab stolen from her." (A.R. 853).  She stated that she did not know who might have taken the medication.  She reported that there were "lots of teenagers that come walking through [her] house."  She stated that she continued to smoke cigarettes.  She denied any other substance abuse. (A.R. 722).  Plaintiff's treating emergency room physician, Thomas Leibold, M.D., noted that plaintiff's symptoms were "very similar" to the symptoms of narcotic withdrawal.  He stated, "I am concerned that her appetite for narcotic analgesia may never be satisfied."  (A.R. 854).

On March 1, 2004, plaintiff was arrested for writing bad checks.  Jail officials noticed that she was slurring her speech and staggering.  She was transported from the jail to Allegan General Hospital.  She reported that she had taken several Xanax pills at once in an attempt to get some sleep.  She was treated for the overdose and kept overnight for observation.  (A.R. 627-33).  Plaintiff stated that marijuana was the only thing that calmed her down and that she had used it twice in the past two weeks.  She denied any other drug use.  Her drug screen was "positive for cocaine and amphetamines."  (A.R. 631).

On March 14, 2004, plaintiff appeared at Borgess-Pipp.  She complained of a persistent headache.  She was "well-known" to the Borgess-Pipp staff.  She had received repeated counseling regarding "the nature of rebound cephalgias [and] the inappropriate use of narcotics and other substances."  (A.R. 716).  Dr. Leibold's discharge summary expressed concern that plaintiff was lying about her substance abuse:

> Discussed with her that I would no longer provide narcotic analgesic here in the emergency room for her.  Also with her clear indications that she is lying about her current substance abuse, metabolic workup was obtained.  This included alcohol which came back positive over 30.  Also, other substances of abuse found to be positive for cocaine, cannabinoids and opiates. Discussed this with the patient.  Discussed with her that her headache may very well be because she did not get any sleep last night and imbibed in substances of abuse.

(A.R. 717).

-14-

The instruction from doctors at Allegan General Hospital on June 21, 2004, was blunt: "Stop smoking – it is killing you." (A.R. 911). On August 8, 2004, plaintiff reported to doctors at Borgess-Pipp that she continued to smoke about a pack of cigarettes per day. She reported that she had a migraine headache and that her headaches "usually respond[ed] to Phenergan, Dilaudid and intravenous fluids." (A.R. 712). Plaintiff was treated and released. Eleven days later, plaintiff reported that her Lortab had been stolen. She received a prescription for Vicodin. (A.R. 710). On June 27, 2004, her drug screen was positive for cocaine, morphine, THC, and benzodiazepines. (A.R. 655).

Plaintiff was hospitalized at Forest View Hospital from June 28, 2004, through July 7, 2004, for substance abuse problems and psychotic symptoms. (A.R. 477). She had no prior history of psychiatric hospitalizations. (A.R. 477). She reported "abuse of substances, including daily marijuana." (A.R. 478). Her urine drug screen was positive for cocaine and cannabinoids. (A.R. 479). Plaintiff indicated that she had recently stopped taking all her medications. She reported a lifelong history of inattentiveness, distractability, and mood swings. (A.R. 493). She experienced withdrawal symptoms during her hospitalization. (A.R. 480). On July 1, 2004, it was noted that she was "cheeking her medication," and then hiding it in her socks. (A.R. 481). On July 4, 2004, plaintiff seemed to be "quite oriented" towards staying in the hospital until her boyfriend was released from jail. (A.R. 481). On July 5, 2004, she appeared to be brighter, less irritable and less depressed. She "continued to be focused on her depression, suicidal ideation, and her auditory hallucinations. There was felt to be some possible underlying desire for her to stay in the hospital longer, and it was felt that she was possibly over reporting her symptoms." (A.R. 481). She "tended to exaggerate her symptoms and continue[d] to report that she wanted to stay in the hospital until her

-15-

boyfriend was released from jail." (A.R. 481).  On July 7, 2004, plaintiff stated that her medications were working and that she planned to live with a friend in Allegan County until her boyfriend was released from jail.  (A.R. 482).  Plaintiff's medication therapy at Forest View was summarized as follows:

> During this hospital stay Shannon was taken off all the benzodiazepine medications and all pain medications.  Instead, the medication Wellbutrin was used for depression and irritability and to help with attention and concentration.  Neurontin was given as a detox from her painkillers and to help stabilize mood during detox.  Seroquel was given as a mood stabilizer, as a way to augment anxiety, and to benefit sleep.  She seemed to have positive benefit from all these medication changes and was discharged in improved condition.

(A.R. 482-83).  Plaintiff's discharge diagnosis was bipolar I disorder, most recent episode mixed, severe with psychotic features, attention-deficit/hyperactivity disorder, combined type, and polysubstance abuse.  (A.R. 483-84).

On November 18, 2004, plaintiff appeared at Borgess-Pipp complaining of a headache and wheezing.  She denied "use of street drugs or alcohol on a daily basis." (A.R. 703).  She was treated for a migraine headache and advised to follow-up with her doctor.  (A.R. 703).  She returned on November 23, 2004, with headache complaints.  Dr. Saad wrote: "She was unhappy that she did not receive a narcotic for her pain.  Before the medicine had enough time to get a full effect, note that the patient left angrily."  (A.R. 702).

On March 6, 2005, plaintiff returned to Borgess-Pipp.  She complained of respiratory distress "secondary to exposure to chicken grease while at work."  (A.R. 690).  She became "exquisitely agitated" upon discovering that a urine drug screen had been obtained.  (A.R. 690).  It "confirmed the presence of cocaine and marijuana."  (A.R. 690).  Doctors found no evidence of respiratory distress.  Physicians noted plaintiff's drug-seeking behavior of requesting narcotic analgesics:

I stressed that I had no findings indicative of respiratory distress.  More anxiety symptoms possibly precipitated from her use of stimulating substances.  She denies engaging in cocaine or smoking of crack.  She states that other family members do, however.  She drives in the car with them.  They are not allowed to use these at home.  The patient seemingly appreciates that these substances may be precipitating her periodic shortness of breath.  Once it was established that she had no needs for further intervention for her respiratory function she stated that she was having a progressive headache.  She requested narcotic analgesic.  Further Ativan was also dispensed.  She subsequently was encouraged to follow up with her primary care physician.

DISCHARGE DIAGNOSIS
•        Anxiety reaction.
•        Drug seeking behavior.
•        Substance abuse.

(A.R. 691).

Borgess Family Medicine progress notes dated July 7, 2005, note plaintiff's positive drug screen.  (A.R. 527).  On July 13, 2005, she sought an early refill of Lortab.  She made another report that her medication had been stolen.  (A.R. 527).  On August 9, 2005, plaintiff sought an early refill of Xanax because she was going "out of town."  Her physician denied this request.  (A.R. 526).

On September 20, 2005, plaintiff was treated at Allegan General Hospital.  She stated that earlier that day she "was having problems with the law" and took a high dose of Xanax and Seroquel.  (A.R. 636).  She had been pulled over by a policeman and was told that she had an outstanding speeding ticket.  She stated that she was concerned that she would have to go to jail.  She "smok[ed] a marijuana joint that had cocaine in it."  (A.R. 931).  She swallowed "eight 100 mg Seroquel, along with four 1 mg. Xanax.  This was an attempt to get out of the situation, not a suicide attempt."  (A.R. 930).  Dr. Fusillo offered a tentative diagnosis of bipolar disorder because he was "not sure how much [plaintiff's] drug abuse play[ed] into her condition," and he expressed significant skepticism regarding the truth of plaintiff's assertion that she did not have a current drug

-17-

problem.  (A.R. 931).  The drug screen of plaintiff's urine was positive for cocaine and THC.  (A.R. 536, 636-37).

On October 25, 2005, Tom Saad, M.D., plaintiff's treating physician, expressed his frustration with plaintiff's persistent refusal to follow his medical recommendations:

S:     She presents for medication refills.  She continues to smoke at least ½ pack of cigarettes per day and is having a lot of difficulties with breathing.  Despite the warnings in the past about smoking, she continues to smoke.  She is well aware that this is the cause of her breathing problems.  She has been taking her ALBUTEROL. She is asking for an increase in her XANAX, but at the same time, she tells me she is tired all the time.  She currently takes XANAX 4 mg and SEROQUEL 800 mg per day.  She is also on LORTAB for back pain.

O:     On examination today, she is in no apparent distress.  Head and neck are unremarkable.  Lungs – there are some scattered rales and wheezes which are chronic.  As mentioned, she continues to smoke, and this is quite detrimental to her, but she continues to smoke despite that.

A:     1) Bipolar disorder.
       2) Asthma.
       3) Chronic tobacco abuse.

P:     1) We again told her that she needs to quit smoking.  Cutting down just does not do it.
       2) I renewed her XANAX and LORTAB without changing the dose of XANAX. She does not need that.
       3) She usually gets samples of SEROQUEL, and we gave her that.  I told her to cut down the SEROQUEL from 400 mg in the morning to just 200 mg in the morning and maintain the 400 mg at night.

(A.R. 522).

On December 21, 2005, Dr. Saad denied plaintiff's requests for Xanax and Lortab refills.  (A.R. 521).  On December 23, 2005, Dr. Saad received information from another patient indicating that plaintiff was selling Xanax and Lortab to the patient's daughter who had a long history of drug abuse.  Dr. Saad wrote, "Shannon is indeed getting Lortab and Xanax from this office.  I find it very convincing that the person knows exactly what drugs are being misused in this

-18-

situation.  Therefore, I have made a decision not to give any more prescriptions for controlled substances to Shannon Dalrymple." (A.R. 520).

On January 3, 2006, plaintiff returned to Dr. Saad.  She claimed that she had never received the letter terminating her as a patient.  (A.R. 519).  Dr. Saad gave this summary of their conversation:

> I confronted her with the issues at hand, and she is apparently associated with this person to whom the drugs were more or less being sold.  She denies ever selling any medication to this person.  The person questioned had apparently asked her several times to give her medications, but Shannon indicates that she steadfastly refused.  The person in question had called her landlord pretending to be an Allegan County Sheriff's Department officer and indicated to her landlord that they had information that she was selling her medications.  She ended up being asked to move out of the apartment she was living in because of that.

(A.R. 519).  Dr. Saad expressed significant doubts regarding plaintiff's story, but he decided to give her one more chance.  He refilled her prescriptions, but imposed restrictions against future refills. (A.R. 519).  January 16, 2006 progress notes reveal that Dr. Saad canceled all plaintiff's prescriptions for Xanax and Lortab.  (A.R. 519).

On January 17, 2006, Dr. Saad noted that he "received some more input from the police that there [was] a very strong suspicion [that plaintiff was] selling her medications." (A.R. 517).  He had the office manager send plaintiff a letter notifying her that she was being terminated as a patient.  "[W]e can no longer accept you as a patient or write prescriptions for you.  Proper medication management requires that the patient follow the recommendations of their physicians very closely, especially when the medication is a controlled substance.  You are being discharged for failure to comply with the controlled substance consent form." (A.R. 515).  Dr. Saad apparently changed his mind, stating that he was willing to keep plaintiff on as a patient, but would no longer prescribe Lortab and Xanax for her.  He prescribed a small quantity of Diazepam for plaintiff's

-19-

"nerves."  He noted, "The DIAZEPAM, of course, does not have that much of a street value and is not in demand like the XANAX or ATIVAN are."  (A.R. 517).

On March 6, 2006, plaintiff reported to Dr. Saad that she had been in jail for three weeks.  She was seeking medication.  Dr. Saad told plaintiff that he "would not give her any controlled substances whatsoever."  (A.R. 512).

On March 8, 2006, plaintiff appeared at Borgess-Pipp and reported a migraine headache.  Physicians made the following notation:  "The patient explains that she has not been able to have her Lortab prescription filled in a timely fashion at this time and that the Lortab usually completely takes care of her discomfort."  (A.R. 824).  She was treated with Dilaudid and Phenergan and received a "to go" supply of Vicodin.  (A.R. 824-25).  The pattern was repeated on March 18, 2006.  (A.R. 678-79).

On April 26, 2006, plaintiff appeared at Dr. Saad's office "basically begging" for medications.  Dr. Saad provided some medication "in a very controlled fashion."  Plaintiff promised that she would not abuse her medications.  (A.R. 511).  On May 26, 2006, plaintiff returned seeking pain medications.  Dr. Saad noted, "We had her on LORTAB before but had cut her off because of suspicion of the fact that she might have been selling her medication."  (A.R. 508).  Dr. Saad stated that he would provide plaintiff with a limited supply of Lortab, with no refills.  His progress notes conclude with the following statement: "Again, I reminded her that we are watching her behaviors very closely, and if there is any suspicion that she is misusing medications, this will result in discharge from the practice.  I have given her too many chances, and I indicated that this definitely will not be overlooked if it happens again."  (A.R. 508).

On June 6, 2006, plaintiff appeared at Borgess-Pipp.  She stated that she had a migraine headache.  Her neurological examination was "completely normal." (A.R. 674).  She was treated with Dilaudid and Phenergan and was advised to stop smoking.  (A.R. 674-75).

On June 21, 2006, plaintiff received a consultative psychological evaluation.  Plaintiff stated that she could not work because she was bipolar, had mood swings, and "hear[d] voices and stuff."  (A.R. 747).  She stated, "They said I did a home invasion, and they charged me with larceny in a building."  (A.R. 747).  She reported that she was living with her boyfriend.  Psychologist Starett gave this description of plaintiff's daily activities:

> She gets up around 11-12 a.m.  She then watches television.  "I'll do the dishes or something.  I sit on the porch and smoke cigarettes.  I wait for my daughter to get home and then I call her.  I sit and watch TV.  I go to bed about 1-12 p.m.["]  She is independent in bathing and grooming.  She is able to do her laundry.  Her boyfriend goes shopping with her for groceries.

(A.R. 748).  Plaintiff reported daily auditory hallucinations and frequent suicidal ideations.  (A.R. 749).  She never informed the psychologist of her substance abuse.  On the basis of plaintiff's self-reporting, Psychologist Starett offered a diagnosis of bipolar II disorder, severe, with psychotic features, chronic, and gave plaintiff a GAF score of 40.  (A.R. 750).

On June 21, 2006, plaintiff's treating physician, Dr. Saad, refused to provide her with the statement of disability that she requested:

> S:  She presents for medication refills.  She needs FIORICET and LORTAB and is also looking for samples of SEROQUEL.  She needs a paper indicating that she is disabled because she is in the process of applying for disability based on her long history of mental disease.
>
> O:  On examination today, she is in no apparent distress.  She has a congested cough which is chronic because she continues to smoke heavily despite our many warnings.  She has underlying asthma.  Lungs have scattered rales and rhonchi and wheezes.  Again this is chronic for her.  We recently did a chest x-ray on her which was surprisingly normal.

A:     1)     Bipolar disorder, with psychotic features.
       2)     Chronic headaches.
       3)     History of substance abuse.

P:     1)     I gave her a limited prescription on her LORTAB.
       2)     I also gave her a prescription for FIORICET.
       3)     I will see her back as needed.

(A.R. 505).

On June 23, 2006, Dr. Saad stated: "Quit smoking now!"  (A.R. 504).  On July 19, 2006, plaintiff appeared at Dr. Saad's office seeking an evaluation of her bipolar disorder.  She stated that she was hearing voices.  Dr. Saad initiated a trial of Doxycycline and advised plaintiff to "totally stop smoking." (A.R. 499).

Plaintiff went to jail in 2006.  She pleaded guilty to a home invasion charge, spent 48 days in jail, and was on probation for three years. (A.R. 982-83).  She continued to drive a car despite the fact that her license had been suspended.  She testified that she had been cited four times for driving on a suspended license, most recently in 2006 or 2007.  (A.R. 988).

On September 20, 2006, plaintiff appeared at Borgess-Pipp.  Dr. Fish noted her drug-seeking behavior and emphasized that she would not be provided with narcotics in the future:

THE PATIENT EXHIBITED DRUG-SEEKING BEHAVIOR AND LEFT AGAINST MEDICAL ADVICE, WITH NO ACCOMPANYING DRIVER AFTER RECEIVING NARCOTICS.

The patient received Dilaudid, Phenergan, normal saline 1 liter and Benadryl 50 milligrams intravenously, and her pain dropped significantly to a 5 from an 8.  She reported feeling better, and stated that she had to leave, and happened to remove her own IV before the nurse could have helped her with this.  The patient was asked to wait for a few moments, until the nurse could assess her again, however, when we went back to find the patient, she was already gone.

She had no ride while here.  It is unclear as to whether she drove herself or walked home.  The patient has been here many times in the past, and at this point I do not plan to use

-22-

narcotics or any medication that will make her drowsy when she enters the ER for migraines in the future.

(A.R. 815).

On January 17, 2007, plaintiff appeared at Michigan Health Choices in Otsego, Michigan. She stated that she was Dr. Saad's patient, but wanted to "switch." (A.R. 582). She informed Ronald Zaph, M.D., that she was "trying to get disability." (A.R. 582). She was on probation, yet she continued to smoke marijuana. Dr. Zaph found that plaintiff was well developed, well nourished, and in no apparent distress. Her affect was normal and appropriate. Her extremities had no clubbing, cyanosis or edema. Plaintiff was able to secure prescriptions for Fioricet, Lortab, and Valium from Dr. Zaph. He warned plaintiff that she "should not smoke pot because of the risk of psychosis." (A.R. 582).

On February 1, 2007, plaintiff returned to Borgess-Pipp complaining of headaches. (A.R. 813). Dr. Fuertes determined that he would "not give this patient any narcotics because of her history of having exhibited drug seeking behavior." She was treated with alternative medications and discharged. (A.R. 814).

On February 15, 2007, plaintiff reported to Dr. Zaph that Xanax worked better for her anxiety than Valium. Dr. Zaph gave her a Xanax prescription. (A.R. 579-81). On February 20, 2007, Dr. Zaph noted that plaintiff was alert and oriented. Her affect was normal and appropriate. Her thought processes were clear and she displayed "normal reasoning and conversational tone and logic." (A.R. 576). Her gait was normal and her motor strength was 5/5. (A.R. 576). On February 20, 2007, Dr. Zaph wrote: "Shannon is unable to work because of her psychiatric and Medical problems." (A.R. 578). X-rays taken on April 9, 2007, were "unremarkable." (A.R. 587-90, 812).

-23-

On April 30, 2007, Dr. Zaph stated: "Shannon is unable to work due to [m]edical and psychiatric illness." (A.R. 565).

On May 4, 2007, plaintiff appeared at Allegan General Hospital. She reported that she smoked a pack of cigarettes per day. She stated that she did not drink alcohol, but admitted occasional marijuana use. (A.R. 883). She received Ultram and Dilaudid in response to her complaints of right lower quadrant pain. Dr. Henelt stated, "I do not plan on refilling these. She needs to be very frugal with these, as she already has some abuse probably going on with pain medications and this could also be encouraging it." (A.R. 884).

On July 6, 2007, per plaintiff's request, a nurse in Zaph's office faxed a letter to the friend of the court regarding her inability to work. (A.R. 560).

On July 17, 2007, a state agency psychologist reviewed plaintiff's medical record and found no marked mental limitations. Plaintiff had one or two episodes of decompensation stemming from her polysubstance abuse. (A.R. 604-18).

On August 30, 2007, plaintiff reiterated that she was trying to get disability. (A.R. 538). On August 30, 2007, Dr. Zaph supplied the tautological statement: "Shannon Dalrymple is not able to work because she is disabled." (A.R. 584; *see* A.R. 553).

On September 13, 2007, plaintiff reported that the pain medication she had received from the emergency room a day earlier had been stolen. She received prescriptions for Lortab and Percocet. (A.R. 549-51). On October 16, 2007, she made a request for an early Percocet prescription refill because her daughter had moved in with her and "swiped" the medication. (A.R. 541). Dr. Zaph provided the early refill. (A.R. 542).

-24-

On October 22, 2007, Dr. Zaph completed a "Medical Provider's Assessment of Ability to Do Mental Work-Related Activities" form.  He offered his opinions that in 2007, plaintiff had "extreme" limitations in her ability to deal with work stresses and maintain concentration.  She had "marked" limitations in her ability to deal with the public, relate to co-workers, and use judgment.  She had "marked" limitations in her ability to understand, remember, and carry out instructions, and in her ability to behave in an emotionally stable manner.  Zaph opined that plaintiff had marked limitations in maintaining concentration, persistence or pace and had four or more episodes of decompensation, each of extended duration.  None of the proffered restrictions were supported by test results.  (A.R. 592-98).

On June 18, 2007, plaintiff began treating with Carolina Flickinger, R.N.  (A.R. 751).  On July 10, 2007, Nurse Flickinger wrote a note stating that plaintiff was "unable to work" because her mental and physical health was "fragile."  (A.R. 751).

On July 31, 2008, the MRI of plaintiff's lumbar spine revealed "mild" degenerative changes without neural compromise.  (A.R. 795).  The MRI of her hips revealed "no acute osseous abnormality" and normal alignment without acute process.  (A.R. 796-97).

On August 8, 2008, Daniel Walberer, Ed.D, conducted a consultative evaluation on a referral from plaintiff's attorney.  Walberer had been provided with excerpts from plaintiff's medical record.  (A.R. 752).  Plaintiff denied any current use of street drugs or alcohol.  She "did admit a history of substance abuse in the past."  (A.R. 753).  Psychologist Walberer did not perform any tests other than asking plaintiff to "fill out a copy of the Minnesota Multiphasic Personality Inventory-2."  He found that the results "seem[ed] to indicate that she answered the questions in a manner that caused her testing to be deemed invalid."  (A.R. 753).  "[S]he answered an unusually

-25-

large number of extreme items in a deviant direction.  Her answers were probably exaggerated."
(A.R. 753).  Walberer stated that he did not feel that plaintiff would function well or independently
in a work setting.  He offered a diagnosis of major depressive disorder, recurrent, severe, generalized
anxiety disorder, rule out bipolar disorder, personality disorder, not otherwise specified, and gave
a current GAF score of 40.  (A.R. 754).  Psychologist Walberer also completed an "Affective
Disorders Professional Source Data Sheet" and an "Anxiety-Related Disorders Professional Data
Sheet."  (A.R. 755, 762).  The consultative psychologist offered his opinion that plaintiff met the
requirements of listing 12.04.  (A.R. 756-57).  He stated that plaintiff was "markedly limited" in
every category of functioning other than in her ability to understand and remember very short and
simple instructions, ability to carry out very short and simple instructions, and the ability to ask
simple questions or request assistance which he characterized as "moderately limited."  (A.R. 759-
67).  Psychologist Walberer assumed that plaintiff was not abusing drugs or alcohol (A.R. 756, 763),
but offered no evidence supporting his assumption.

On August 14, 2008. Nurse Practitioner Flickinger completed  a "Medical Provider's
Assessment of Ability to Do Mental Work-Related Activities."  (A.R. 948).  She offered her opinion
that plaintiff had "extreme limitations" in every category of functioning, with the exception of
"moderate limitations" in her activities of daily living.  (A.R. 948-50).  Nurse Flickinger also
completed a "Medical Provider's Assessment of Patient's ability to do Physical Work-Related
Activities."  (A.R. 942).  She asserted that plaintiff could sit, stand, or walk "0 hours" in an 8-hour
workday, and should "never" stoop, reach above shoulder level, squat, kneel, crouch, crawl or climb
ladders, ropes, or scaffolds.  (A.R. 942-45).

The ALJ's finding that plaintiff's substance use disorder was material to a finding of disability is supported by overwhelming evidence. The ALJ was not required to accept plaintiff's claims of recent sobriety. The court finds no basis for disturbing the Commissioner's decision.

**4.**

Plaintiff argues that there is substantial evidence in the record that her mental impairments, absent a substance use disorder, met or equaled the requirements of listing 12.04. (Plf. Brief at 9-13; Reply Brief at 3-4). This argument does not suffice as a basis for disturbing the Commissioner's decision, because it is plaintiff's burden to show that the ALJ's findings are unsupported by substantial evidence, not that there is evidence from which the ALJ could have reached the opposite conclusion. *Jones v. Commissioner*, 336 F.3d at 477; *see Kyle v. Commissioner*, 609 F.3d at 854.

The ALJ found that plaintiff met the requirements of listing 12.09 for substance addiction disorders.[3] *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.09. "The severity of a substance addiction disorder under section 12.09 [] is evaluated under the requirements of other applicable sections of the Listing of Impairments." *Rabbers v. Commissioner*, 582 F.3d 647, 650 n.3 (6th Cir. 2009). "Unlike other mental disorder listings, 12.09 does not consist of a statement describing the disorder together with a list of necessary medical findings and a list of necessary functional limitations. Instead, it 'is structured as a reference listing; ... it ... only serve[s] to indicate

---

[3]"Although generally a claimant who meets the requirements for one of the disorders in the list of impairments is considered disabled without further inquiry, legislation passed in 1996 precludes a claimant from obtaining disability benefits or supplemental security income if either alcoholism or drug addiction is a 'contributing factor material to the [Social Security Administration's] determination that the individual is disabled.'" *Pettit v. Apfel*, 218 F.3d 901, 902 (8th Cir. 2000)(quoting 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)) (citation omitted).

which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances.' *Id.* § 12.00(A) (emphasis added). The required level of severity for a substance addiction disorder is met when, as a result of substance abuse, the requirements in one or more of Listings 12.02, 12.04, 12.06, 12.08, 11.14, 5.05, 5.04, 5.08, 11.02, or 11.03 are satisfied. *Id.* § 12.09." *Alderete v. Barnhart*, 114 F. App'x 353, 355 (10th Cir. 2004). Accordingly, the ALJ looked at listing 12.04 for affective disorders to evaluate plaintiff's depressive syndrome. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.09(B).

The ALJ found that plaintiff did not meet the requirements of listing 12.04 except as a result of her substance abuse. (A.R. 24-25). He found that when plaintiff's substance use disorder was taken into account, she suffered from "marked" restriction in activities of daily living, marked limitation in social functioning, marked difficulty maintaining concentration, persistence, or pace, and four or more episodes of decompensation. (A.R. 24). Absent the substance abuse disorder, plaintiff's mental impairments did not satisfy the severity requirements of listing 12.04:

> In the absence of her substance use disorder, her other mental impairment is not attended by the medical findings required by Listing 12.04. Absent her narcotic addiction, the claimant's bipolar disorder does not result in the degree of limitation of functioning required by the Paragraph "B" criteria of this listing, nor are limitations documented as described in the paragraph "C" criteria of the listing.

> The undersigned finds it reasonable to conclude that an absence of the claimant's substance use disorder would result in a decrease of the degree of functional limitation she experiences as a result of her bipolar disorder alone. In assessing the claimant's functioning as a result of her mental impairment, in the absence of her substance use disorder, the undersigned concludes that she has the following degree of limitation in the broad areas of functioning cited in the disability regulations for evaluating mental disorders and in the mental disorders listings: *mild* restriction of daily activities; *moderate* difficulty with maintaining social functioning; and *mild* difficulty with maintaining concentration, persistence or pace. *One or two* episodes of decompensation are documented independent of the claimant's substance use disorder.

(A.R. 25-26).  The court finds that the ALJ applied the correct legal standards and that his factual findings are supported by more than substantial evidence.

**5.**

Plaintiff argues that the ALJ should have given greater weight to the opinions expressed by consultative psychologists Walberer and Starett.  Further, she argues that opinions expressed by Nurse Flickinger should have received controlling weight under the treating physician rule, and that the ALJ violated her procedural right to "good reasons" for discounting a treating physician's opinions.  (Plf. Brief at 17-18).  The court finds no basis for disturbing the Commissioner's decision.  Nurse Practitioner Flickinger was not an acceptable medical source, and her opinions were not entitled to any particular weight.  The ALJ, not the court, determines what weight should be given to the opinions of consultative examiners like Psychologists Walberer and Starett.  The ALJ provided detailed explanations why the opinions Walberer, Starett, and Flickinger provided were given little weight.

A.    Nurse Practitioner Flickinger

A nurse practitioner is not an "acceptable medical source." See 20 C.F.R. §§ 404.1513(a), (d); *see also Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010).  Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule.  *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and*

-29-

*Nongovernmental Agencies*, SSR 06–3p (reprinted at 2006 WL 2329939, at * 2 (SSA Aug. 9, 2006)).

The opinions of a nurse practitioner fall within the category of information provided by "other

sources." *Id.* at * 2; *see* 20 C.F.R. § 404.1513(d).  The social security regulations require that

information from other sources be "considered."  2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§

404.1512, .1527).  This is not a demanding standard, and it was easily met here.  The ALJ considered

Nurse Practitioner Flickinger's opinions and found that they were entitled to little weight:

> The undersigned has awarded no significant weight to the opinion offered in July 2008 from
> C. Flickinger, N.P., the nurse practitioner who is the claimant's current primary care medical
> provider for physical concerns, as, again, no objective medical record evidence to support
> her conclusory statement was referenced (Exhibit 42f/p.1)[A.R. 751].  The same reasoning
> applies to her opinions offered in August 2008 purporting to define limitations in the
> claimant's physical and mental functional capacities retroactive to at least June, 2004 when
> the record evidence indicates that this medical provider did not commence treating plaintiff
> until Ju[ne] 2008 (Exhibits 42f, 53f/pp. 4-1 and 54f/pp 3-1)[A.R. 751, 945, 950].
> Additionally, there is no indication in the record that Ms. Flickinger has any particular
> qualifications, training or licensure that would qualify her to issue opinions concerning the
> diagnostic nature of any psychological condition or the extent to which such conditions may
> limit an individual in he workplace.  As such, she is not an acceptable medical source.

(A.R. 29).  The ALJ was not required to give any weight to Nurse Flickinger's opinions.  The lack

of objective evidence supporting her opinions and her lack of qualifications to render psychological

opinions were appropriate grounds for discounting her opinions.  *See Buxton*, 246 F.3d at 773; *see*

*also Payne v. Commissioner*, 402 F. App'x 109, 115 (6th Cir. 2010).

### B.    Psychologist Starett

Plaintiff argues that the ALJ should have given greater weight to Psychologist

Starett's diagnosis of bipolar II disorder and the GAF score of 40 he provided.  GAF scores are a

subjective rather than an objective assessment and were not entitled to any particular weight.  *See*

*Kornecky v. Commissioner*, 167 F. App'x 496, 511 (6th Cir. 2006).  "GAF examinations measure

-30-

psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Commissioner*, 572 F.3d 272, 276 (6th Cir. 2009).  "GAF is a clinician's subjective rating of an individual's overall psychological functioning.  A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.  Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see Kornecky*, 167 F. App'x at 503 n.7.  The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM-IV's) explanation of GAF scale indicates that "a score may have little or no bearing on the subject's social and occupational functioning."[4]  *Kornecky*, 167 F. App'x at 511; *see Oliver v. Commissioner*, 415 F. App'x 681, 684 (6th Cir. 2011).  The ALJ found that plaintiff's overall unwillingness to participate in assessments created "great doubt" that plaintiff's low GAF scores reflected her true level of functioning.  (A.R. 24).  In June 2006, plaintiff did not require any psychological care.  Her statement to Starett that she experienced daily auditory hallucinations was not supported by the record:

> The undersigned has also accorded little weight to the opinion of G. Starett, Ed. D., who psychologically evaluated the claimant in June 2006 at the request and expense of the Administration as the claimant obviously exaggerated her history regarding the frequency and severity of her hallucinations (Exhibit 41f)[A.R. 749].  A frequency of daily auditory hallucinations, as reported to Dr. Starett, was never related to her own treatment providers; she told Dr. Zaph at her first visit in January 2007 that she experienced hallucinations "every once in a while" (Exhibit 30f/p.45)[A.R. 582].  The only mental health treatment she was receiving at the time of Dr. Starett's evaluation was medication from her primary care physician, Dr. Saad, whose treatment notes indicate his suspicions of her misusing

---

[4] "Significantly, the SSA has refused to endorse the use of the GAF scale."  *Bennett v. Commissioner*, No. 1:07-cv-1005, 2011 WL 1230526, at * 3 (W.D. Mich. Mar. 31, 2011).  GAF scores "have no direct correlation to the severity requirements of the mental disorder listings." *DeBoard v. Social Security Admin.*, 211 F. App'x 411, 415 (6th Cir. 2006).

medications and that he was contemplating her discharge from his practice (Exhibit 29f/p.14)[A.R. 508].

(A.R. 28).  The ALJ is responsible for weighing medical opinions, not the court.  *See Buxton*, 246 F.3d at 772-75; accord *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009).

        C.    Psychologist Walberer

                Plaintiff argues that the ALJ should have given greater weight to Psychologist Walberer's opinions that she had marked restrictions in almost every category of functioning.  The ALJ found that the consultative psychologist's opinions were entitled to little weight:

> The undersigned has also specifically considered the opinion regarding the claimant's mental limitations offered in August 2008 from D. Walberer, Ed. D., who evaluated the claimant at the request of her attorney, and accords little weight as such is inconsistent with the findings on his own evaluation (Exhibit 43f)[A.R. 752-67] – he stated that the claimant did not exaggerate her complaints (page 3)[A.R. 754], yet noted that the results of MMPI testing were invalid due to probable exaggeration (page 2)[A.R. 753].  In addition, his ratings regarding the Part C criteria of Listing 12.04 are wholly unsubstantiated within the record. The effect of the claimant's substantial and long-term history of substance abuse was not taken into account as Dr. Walberer primarily focused on the claimant's version of the present in this regard, apparently willing to accept her self-report denying current use of alcohol and illegal drugs (page 2).  His report attempts to portray the claimant as having a history of serious, long-term psychiatric treatment; however, even taking into account the psychiatric admissions in March 2004 (Exhibit 37f)[A.R. 634-37], June 2004 (Exhibit 28f)[A.R. 477-94, and September 2005 (Exhibit 38f)[A.R. 634-47] – all of which were preceded by episodes of substance abuse and/or medication noncompliance – there is very little additional mental health treatment documented in the record.  Her bipolar disorder was primarily treated with medication therapy by her primary care medical providers and she fairly consistently reported doing well in response to that treatment.

(A.R. 27-28).  Walberer's report was internally inconsistent.  The only test he performed indicated that plaintiff was exaggerating her symptoms (A.R. 753), yet in the very next paragraph he asserted there "were no signs of symptom magnification."  (A.R. 754).  Although Walberer was willing to accept plaintiff's denial of current substance abuse at face value and attribute all her psychological problems to psychological impairments, the ALJ was certainly not required to follow suit, given

-32-

plaintiff's history of substance abuse.  The ALJ gave each source of information the weight it deserved.

## **Conclusion**

For the reasons set forth herein, the Commissioner's decision will be affirmed.


Dated:  November 1, 2012              /s/  Joseph G. Scoville                            
                                     United States Magistrate Judge

-33-